Donald G. SMITH, Sr., and Brenda Smith, individually and as natural parents, guardians and as next friend of Crystal Smith, a minor, Plaintiffs,

v.

**ORTHO PHARMACEUTICAL CORPORATION,**
Defendant.

Civ. A. No. 1:84–CV–1440–HTW.

United States District Court,
N.D. Georgia,
Atlanta Division.

Jan. 30, 1991.

ion would follow. All parties were also in-

formed of the July 29, 1991 trial date.

**1562**

F. Glenn Moffett, Jr., Leonard Prentice Eager, III, Moffett & Henderson, Atlanta, Ga., for plaintiffs.

John J. Dalton, Nancy Karen Deming, Robert L. Pennington, Troutman Sanders Lockerman & Ashmore, Atlanta, Ga., Barry L. Shapiro, Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, Newark, N.J., for defendant.

## ORDER OF COURT

HORACE T. WARD, District Judge.

This matter is pending on defendant's motion for summary judgment and defendant's motion to preclude the testimony of plaintiffs' proposed causation experts or, in the alternative, for a hearing *in limine* to determine their qualifications and the admissibility of their opinions. Also pending is plaintiffs' motion to strike certain affidavits.

### I. INTRODUCTION

Plaintiffs in this products liability action seek damages for Crystal Smith, who was born with a genetic or chromosomal abnormality. Crystal has a number of malformations, all of which derive from this genetic abnormality. Plaintiffs' complaint alleges that Conceptrol, a vaginal spermicide manufactured by Ortho Pharmaceutical Corporation ("Ortho") caused Crystal's malformations. The complaint also alleges that Ortho failed to warn that Conceptrol causes birth defects.

### II. PROCEDURAL BACKGROUND

Plaintiffs have previously moved for partial summary judgment based on the doctrine of offensive collateral estoppel. Relying on *Wells v. Ortho Pharmaceutical Corp.*, 615 F.Supp. 262 (N.D.Ga.1985), *aff'd & modified in part, remanded,* 788 F.2d 741 (11th Cir.), *cert. denied,* 479 U.S. 950, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986) (*"Wells"*), the plaintiffs sought to avoid litigating the issue of whether defendant's spermicide causes birth defects.[1]

This court denied plaintiffs' motion because of the factual differences between this case and *Wells* and the availability of new scientific data. The issue of causation with respect to spermicide and birth de-

---

1. The *Wells* case was tried before Judge Shoob. In 1986 Judge Shoob recused himself from this suit and it was reassigned to this court. In April 1987 a status conference was held. The parties sought to reopen discovery in order for plaintiffs to add some new expert witnesses and for defendant to address some new scientific evidence. Discovery was reopened and the court permitted defendant to file the pending motions. A hearing on the motion for summary judgment was held on July 11, 1988.

fects has been extensively researched since the *Wells* decision. The defendant, in turn, seeks to use this new research data to demonstrate that as a matter of law plaintiffs cannot prove that Crystal's malformations were caused by Mrs. Smith's use of spermicide.

Defendant moves to preclude the testimony of plaintiffs' proposed causation experts or, in the alternative, for a hearing *in limine* to determine their qualifications and the admissibility of their opinions. Defendant argues that the opinions of plaintiffs' experts are not admissible under F.R.Evid. 703, as neither of plaintiffs' experts bases his opinion on the type of data reasonably relied upon by experts in the medical field in forming opinions.

The parties filed their briefs and supporting material and a hearing was held on July 11, 1988. After reviewing the arguments and supporting material the court took the motions under advisement and permitted the parties to file supplemental law as it became available.[2] This matter has remained under advisement for an extended period of time in order for the court to study the materials in depth and to permit more of a consensus on the disputed issues to develop in the legal and scientific communities.

## III. BACKGROUND

Brenda Smith was 38 years old at the time she conceived Crystal. She first purchased Conceptrol in July, 1979, and states that she read the label of the product at that time. The label of the product did not contain a warning that use of the product might lead to an increased risk of birth defects. Mrs. Smith states that she used Conceptrol as her method of birth control for a ten-month period of time prior to the conception of Crystal Smith and for a period of time thereafter until such time as she was sure she was pregnant. Crystal Smith was born in January 1981 with serious birth defects resulting from a chromosomal abnormality known as Trisomy–18.

### A. The Nature of Conceptrol Spermicide.

Conceptrol is a vaginal spermicide sold as an over-the-counter product. It contains one active ingredient, nonoxynol–9, which is a nonionic surfactant. A surfactant is a "surface active agent." The term includes substances commonly referred to as "wetting agents, surface tension depressants, detergents, dispersing agents [and] emulsifiers."[3] Nonionic surfactants comprise a class of detergents that have been shown to be effective spermicidal agents.[4] The spermicidal activity appears to be a result of the interaction of the surfactant with the sperm cell membrane resulting in increased cell permeability, loss of mobility and eventual destruction.[5] One of the most commonly utilized nonionic detergent spermicidal agents is nonoxynol–9. While a number of spermicidal agents are designed to be used with a diaphragm, Conceptrol is designed to be used alone.

### B. The Regulatory History of Nonionic Surfactant Spermicides.

In the early 1970's the Federal Food and Drug Administration ("FDA") established several expert advisory panels to review the "safety and efficacy" of all over-the-counter drugs.[6] The panel designated to review spermicides first met on August 2, 1973. Because of its concern over the use of spermicide and its affect on the health of women and their offspring:

The panel ... concluded that as part of its mandate, it would give special attention to the issues involved in labeling and patient instructions, effectiveness rates, delivery systems, vaginal absorption, fe-

---

**2.** Both parties filed numerous additional cases and argued, generally in letter form, the applicability of said cases on the present issues. The letters and accompanying cases will be added to the record.

**3.** *Stedman's Medical Dictionary*, 1373 (24th ed. 1982).

**4.** 45 Fed.Reg. 82026 (1980).

**5.** *Id.*

**6.** 21 C.F.R. §§ 330, 330.10 and 330.12; 37 Fed. Reg. 9,464, 9,466 (1972).

tal and infant damage, mutagenicity, and carcinogenicity.[7]

The panel last met on December 9, 1978 and, thereafter, submitted to the FDA its proposed final report concerning vaginal contraceptive drug products.[8] The panel noted that more studies would be desirable with respect to several issues but concluded that vaginal contraceptives containing nonionic surfactants are safe and effective for over-the-counter use.[9]

The FDA's interest in vaginal spermicides was renewed in November 1983 when the Agency requested that one of its standing expert committees, the Fertility and Maternal Health Drugs Advisory Committee ("FMHDAC"), evaluate the safety of vaginal spermicides.[10] After considering the evidence, which included the studies then available, the FMHDAC found that:

> [T]he preponderance of the weight of the currently available evidence indicates no association between the maternal spermicide exposure and an increased rate of abortions or congenital malformations.[11]

On June 24, 1986, the FDA issued a "Talk Paper" stating that:

> Recent lawsuits have attempted to show a link between spermicides and an increased risk of birth defects. As a result, there have been questions regarding FDA's position on the question.

The article discussed some studies showing a risk of increased birth defects from spermicide use, and then concluded:

[The] FDA concurred with the Fertility and Maternal Health Drugs Advisory Committee and forwarded its recommendation (that a warning was not warranted) to FDA's Over–The–Counter Drugs division, which is completing a review of vaginal contraceptive products.[12]

The FDA subsequently reaffirmed its adoption of the FMHDAC report, noting that:

> [The] FDA has concluded that the weight of the present evidence does not support an association between the use of spermicides and birth defects or miscarriage.
>
> *     *     *     *     *     *
>
> Based on all available data, FDA has concurred with its Advisory Committee on Fertility and Maternal Health Drugs in concluding that there is no need for a labeling revision of spermicidal products. The Agency will continue to monitor the situation and advise the medical community should there be further developments.[13]

## IV. DISCUSSION

### A. *The Legal Standard for Summary Judgment.*

The standard for the grant or denial of summary judgment is set forth in the Supreme Court's trilogy of 1986 decisions that clarified the proper analytical framework. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

7.  45 Fed.Reg. 82,014, 82,017 (1980).

8.  45 Fed.Reg. 82,014–049 (1980).

9.  45 Fed.Reg. 82,014, 82,028–83,031 (1980).

10.  48 Fed.Reg. 51,533 (1983). There are nineteen such standing committees which recommend the labeling for various classes of drugs, *e.g.,* anti-hypersensitive, anti-inflammatory.

    The committees are comprised of members of the scientific and medical communities who are engaged in research and clinical practice.... A committee may be asked to resolve a question arising at any stage of the review process.

    Dorsey, *Final Report of the Review Panel on New Drug Regulation* (1977), reprinted in *The Drug Regulation Reform Act of 1978: Hearings*

*on H.R. 11611,* before The Subcommittee on Health and Environment of the Committee on Interstate and Foreign Commerce, 95th Cong.2d Sess. at 599 (1978).

11.  *Transcript of the hearing of the Advisory Committee,* pp. 174–179, Exhibit D to Shapiro Affidavit. Dr. Brent stated:

    [W]e could never say that an agent has no risk.... [B]ased on the evidence we have here today, the data doesn't indicate that the risk is either measurable or presents a safety hazard to the public.

    *Id.,* p. 177.

12.  *Talk Paper,* Food and Drug Administration, T86–45, June 24, 1986.

13.  16 *FDA Drug Bulletin,* 21 (November 1986).

242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In those cases, the Supreme Court explained that the standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2511–12. "[T]he requirement is that there be no genuine issue of material fact." *Id.,* at 248, 106 S.Ct. at 2510.

The party opposing a summary judgment motion has the burden of producing proof to support its legal claim, particularly when the opposing party has had an opportunity to conduct discovery. *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53. All facts and inferences "must be viewed in the light most favorable to the party opposing the motion." *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356 (*quoting United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

Rule 56 of the Federal Rules of Civil Procedure controls summary judgment practice in federal district courts and is proper only where the federal standard is satisfied. *Reinke v. O'Connell,* 790 F.2d 850, 851 (11th Cir.1986). *See also, Schultz v. Newsweek, Inc.,* 668 F.2d 911, 917 (6th Cir.1982).

■ Under Georgia product liability law, a plaintiff must prove as part of its *prima facie* case that the defendant's product was the proximate cause of the injuries alleged. *Blackston v. Shook & Fletcher Insulation Co.,* 764 F.2d 1480, 1482 (11th Cir.1985); *Talley v. City Tank Corp.,* 158 Ga.App. 130, 279 S.E.2d 264, 269 (1981). Plaintiffs bear the burden of proving causation to a reasonable degree of medical certainty. *Parrott v. Chatham County Hospital Authority,* 145 Ga.App. 113, 243 S.E.2d 269 (1978); *Maddox v. Houston County Hospital Authority,* 158 Ga.App. 283, 279 S.E.2d 732 (1981).

Summary judgment is appropriate if there is a lack of sufficient probative evidence for the plaintiffs' case since the,

> inquiry involved in a ruling on a motion for summary judgment ... necessarily implicates the substantive evidentiary standard of proof that would apply at a trial on the merits ... The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether a reasonable juror could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.

*Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512; *accord Dominick v. Dixie National Life Ins. Co.,* 809 F.2d 1559, 1572 (11th Cir.1987); *Stamps v. Ford Motor Co,* 650 F.Supp. 390, 394–95 (N.D.Ga.1986).

Ortho seeks summary judgment on the basis that plaintiffs can put forth no admissible evidence on causation. Ortho contends that plaintiffs' experts are not qualified as experts and that their opinions are not admissible because they lack sufficient basis in the field of genetics and epidemiology.

In light of the Supreme Court's ruling in *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356, the plaintiffs must establish that there is a genuine issue of material fact concerning whether Conceptrol was the proximate cause of Crystal's malformations in order to survive Ortho's motion for summary judgment. Since the scientific evidence produced by Ortho renders their claims implausible, plaintiffs must produce admissible scientific evidence sufficient to support their claims that defendant's product caused Crystal's malformation.

Scientific testimony by expert witnesses on the issue of causation plays an increasingly vital role in products liability litigation.[14] Defendant's motions require the

---

14. See generally, Black & Lilienfeld, *Epidemiologic Proof in Toxic Tort Litigation,* 52 Fordham L.Rev. 732, 744–49 (1984) (case examples); McElveen & Eddy, *Cancer and Toxic Substances: The Problem of Causation and the Use of Epidemiology,* 33 Clev.St.L.Rev. 29, 31–37 (1984–1985) (general discussion).

court to consider the interplay and application of Federal Rules 702 and 703. These Rules control the admissibility of plaintiffs' evidence concerning causation.

### B. *Qualifications of Experts under F.R.E. 702.*

■ In determining whether an expert should be allowed to testify, the court must first determine whether the expert is sufficiently qualified in his or her field. *Frazier v. Continental Oil Co.*, 568 F.2d 378, 383 (5th Cir.1978); *In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1223, 1242 (E.D.N.Y.1985), *aff'd* 818 F.2d 187 (2nd Cir.1987), *cert. denied*, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988). For if the expert is not qualified, his or her opinion is inadmissible regardless of the content of the opinion.

■ Defendant argues that, under the standard set by Federal Rule of Evidence 702, plaintiffs' causation experts are not qualified to give expert opinions regarding the cause of Crystal Smith's birth defects. Defendant argues that plaintiffs' experts "lack the requisite skill, education, training and experience to express educated, principled and scientific opinions on whether, as a general proposition, Conceptrol spermicide causes birth defects in humans and, if so, the mechanism by which this occurs." Defendant accordingly asserts that under the standard set by Rule 702, plaintiffs' proffered experts are not qualified to testify as experts. Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may

testify thereto in the form of an opinion or otherwise.

Rule 702 thus contains two prerequisites to the admissibility of expert testimony: appropriate expertise on the part of the witness and helpfulness of the expert opinion to the trier of fact.[15] Satisfaction of these two requirements permits the expert to testify, even on the ultimate issues in the case, although he or she may have no personal knowledge of the matter on trial.[16] Under this rule, only witnesses who are, "qualified as an expert by knowledge, skill, experience, training, or education," may give expert testimony.

Unfortunately, neither Eleventh Circuit nor former Fifth Circuit precedent provide much guidance to the court beyond the language of this provision. Other circuits have held that, in determining whether a proffered expert witness satisfies this standard, a trial court should look to whether the expert's "education and experience demonstrate a knowledge of the subject matter." *Hill v. Gonzalez*, 454 F.2d 1201, 1203 (8th Cir.1972). The proffered expert, "need not have complete knowledge about the field in question, and need not be certain. He need only be able to aid the jury in resolving a relevant issue." *Mannino v. Int'l. Mfg. Co.*, 650 F.2d 846, 850 (6th Cir. 1981).

The other key factor in determining whether a witness is qualified to be an expert is whether his or her testimony would be of assistance to the jury. *Exum v. General Elec. Co.*, 819 F.2d 1158, 1164 (D.C.Cir.1987); *Friendship Heights Assoc. v. Vlastimil Koubek, A.I.A.*, 785 F.2d 1154, 1159 (4th Cir.1986); *Mannino*, 650 F.2d at 850–851. As the Sixth Circuit explained when reversing a trial court's determina-

---

**15.** Professor Wigmore's often repeated question under Rule 702 is, "Can the jury receive assistance on this subject from this person?" 7 J. Wigmore, *Evidence* § 1923, at 29 (J. Chadbourn, rev.ed.1978).

**16.** Expert testimony is an exception to Rule 602's general command that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." Fed.R.Evid. 602. In fact, Rule 602 specifically exempts ex-

pert testimony from its coverage: "[t]his rule is subject to the provisions of Rule 703, relating to opinion testimony by expert witnesses." Rule 703 allows an expert witness to express opinions based on facts of which he does not have personal knowledge. However, the court must find that the witness is qualified to testify as an expert under Rule 702 before the personal knowledge exception of Rule 703 comes into play.

tion that a proffered witness was not an expert:

> [A] proposed expert witness 'should not be required to satisfy an overly narrow test of his own qualifications'.... An expert need not have certificates of training nor membership in professional organizations.... Nor need he be ... an outstanding practitioner in the field in which he professes expertise. Comparisons between his professional stature and the stature of witnesses for an opposing party may be made by the jury....

*United States v. Barker,* 553 F.2d 1013, 1024 (6th Cir.1977).

■ The plaintiffs proffer the expert testimony of Dr. Joseph G. Bussey and Dr. John Holbrook who would testify at trial that Mrs. Smith's use of Conceptrol caused Crystal Smith's trisomy–18. Dr. Bussey is a licensed medical doctor and general surgeon who graduated from Emory University School of Medicine in 1965 and has practiced medicine since. Dr. Bussey has not specialized in the areas of genetics, epidemiology, or teratology;[17] his professional work and research interests have primarily dealt with pain control and general surgery. He has not received any formalized training in genetics or teratology since he left medical school. He has never spoken to a group of health care professionals on the causes of birth defects and other physicians do not refer patients to him for consultation in ascertaining the cause of the patient's birth defects. Other than for purposes of litigation, he has never been consulted to determine the cause of birth defects. Dr. Bussey has published no articles dealing with issues surrounding birth defects. However, Dr. Bussey has examined Crystal Smith and has reviewed medical literature concerning the possible association of spermicides with birth defects.

Dr. Bussey's professional opinion deals with the issue of causation. Plaintiffs assert that,

> [b]ased upon [Bussey's] experience and training in the medical field, his examination of Crystal Smith, and his extensive reading on the subject matter involved in this litigation, it is Dr. Bussey's opinion that the use by Brenda Smith of the spermicide Conceptrol, manufactured by Defendant Ortho, caused the Trisomy–18 in Crystal Smith, and that generally, spermicide usage causes an increased risk of birth defects in infants born of mothers who used spermicide.

Dr. John Holbrook received his Ph.D. in pharmacology from the University of Mississippi in 1974. He holds an academic appointment as Professor of Pharmaceutical Sciences at Mercer University School of Pharmacy. His primary area of expertise is in the area of behavioral pharmacology. He has no specialized training in teratology or genetics and very little specialized training in epidemiology. However, he also has reviewed numerous articles on the possible association between spermicides and birth defects.

Dr. Holbrook's professional opinion also addresses the issue of causation in this case. Plaintiffs assert that,

> [b]ased upon [Holbrook's] training and experience in the field of pharmacology, and based upon his review of the relevant articles concerning this subject matter, it is Dr. Holbrook's opinion that spermicides and in particular, the spermicide Conceptrol manufactured by the Defendant, mechanistically, has the potential and is capable of causing Trisomies in infants born of mothers who used spermicides.

Defendant argues that Drs. Bussey and Holbrook are not qualified as experts within the context of this case because they lack specialized training in the relevant fields of genetics, epidemiology, and teratology. The court cannot escape the conclusion that, if plaintiffs' witnesses had such specialized training, the question before the court would be much simpler to resolve. Nevertheless, the heavy weight of

---

**17.** Teratology is the division of embryology and pathology which relates to abnormal development and congenital malformations.

authority holds that a physician need not be a specialist in the area of his testimony in order to be considered an expert under Rule 702.

> The fact that the physician is not a specialist in the field in which he is giving his opinion affects not the admissibility of his opinion but the weight the jury may place on it.

*Payton v. Abbott Labs,* 780 F.2d 147, 155 (1st Cir.1985); *see also, Morlan v. Harrington,* 658 F.Supp. 24, 26 (D.N.D.1986); *Cheek v. Domingo,* 628 F.Supp. 149, 152–53 (D.V.I.1986); *Hedgecorth v. United States,* 618 F.Supp. 627, 631 (D.Mo.1985); *In re Agent Orange,* 611 F.Supp. at 1242–43; *Snead v. United States,* 595 F.Supp. 658, 663 (D.D.C.1984); *Heinze v. Heckler,* 581 F.Supp. 13, 14 (E.D.Pa.1983).[18]

Defendant presents affidavits from its expert witnesses which critique the deposition testimony of Drs. Bussey and Holbrook and conclude that plaintiffs' proffered experts are not qualified to offer expert opinions concerning the cause of Crystal Smith's birth defects. Defendant's experts have extensive training in relevant specialties and have made comprehensive studies of whether spermicide usage causes an increased risk of birth defects in infants born of mothers who used spermicide. These experts' opinions of the views and qualifications of Drs. Bussey and Holbrook could appropriately be accorded dispositive weight by a finder of fact.

■ However, in the context of summary judgment the court cannot simply accept the views of one party's experts concerning the qualifications of the experts offered by the party opponent. "One expert's testimony that another experts' view is spurious is generally an inadequate basis for exclusion of expert testimony." *Ostrander v. Cone Mills, Inc.,* 119 F.R.D. 417, 420 (D.Minn.1988), *citing Wright v.*

*Commercial Union Ins. Co.,* 818 F.2d 832, 836 (11th Cir.1987). Defendant's contention would force the court to determine whether a witness is qualified as an expert by the proffered testimony rather than the expert's qualifications.

The proffered experts' qualifications in medicine have been noted above. The court has reviewed their deposition testimony extensively. Dr. Bussey and Dr. Holbrook appear to possess the requisite knowledge to be considered experts within the meaning of Rule 702.[19]

The next determination required under Rule 702 is whether the testimony of plaintiffs' experts would be of assistance to the jury. This determination is made by deciding whether the jury can satisfactorily appraise the evidence without the expert's help. If the matter is susceptible of the reasoned consideration of the common experience and understanding of the jury, the expert's testimony will not usually be admissible. 11 *Moore's Federal Practice* § 702.10. It can hardly be disputed that expert testimony would assist the jury in the trial of this case.

Thus, Dr. Holbrook and Dr. Bussey will be considered experts.

### C. *The Admissibility of Plaintiffs' Expert Opinions under F.R.E. 703.*

If an expert witness meets Rule 702's two-fold threshold, the door is opened under Rule 703 to testimony by the witness to an opinion based on facts or data not personally known to the witness or otherwise admissible in evidence—if of the kind reasonably relied upon by experts in his or her field. Fed.R.Evid. 703.

Defendant contends that the opinions of plaintiffs' experts are not admissible under Rule 703, as neither of plaintiffs' experts bases his opinion on the type of data rea-

---

**18.** *But compare, Will v. Richardson–Merrell, Inc,* 647 F.Supp. 544, 548 (S.D.Ga.1986) (court excluded proffered opinion testimony regarding cause of birth defect where witness conceded he was not an expert on the causation issue and said he had not reviewed medical literature on the subject).

**19.** The court defers any determination of Rule 702's requirement that their testimony would be of assistance to the jury. In this case, such a determination is dependant upon a resolution of the issue of whether plaintiffs' expert testimony has a sufficient basis under Rule 703. Any expert opinion testimony lacking a sufficient basis would be unhelpful to a jury.

sonably relied upon by experts in the field in forming scientific or medical opinions regarding the cause of birth defects. Defendant also argues that the plaintiffs' proposed expert opinions lack a "sound" underlying methodology and constitute mere speculation.

We have been unable to find binding precedent in this Circuit addressing whether the court must look behind an expert's opinion to determine whether the underlying data relied upon by an expert are of a type reasonably relied on by experts in the field in forming opinions, or inferences upon a subject. But the former Fifth Circuit has stated,

> Though courts have afforded experts a wide latitude in picking and choosing the sources on which to base opinions, Rule 703 nonetheless requires courts to examine the reliability of those sources.

*Soden v. Freightliner Corp.*, 714 F.2d 498, 505 (5th Cir.1983).[20]

■ Conflicts in expert testimony typically go to the weight rather than the admissibility of expert opinions. The weighing of one expert's testimony against another is a function which must ordinarily remain the responsibility of the fact finder. Thus, generally, it is for the jury with the assistance of vigorous cross-examination to measure the worth of conflicting expert opinions. *Singer v. E.I. du Pont de Nem-ours & Co.*, 579 F.2d 433, 443 (8th Cir. 1978).

However, it has been held recently that, under the Federal Rules of Evidence, a federal court must determine whether the data supporting an expert opinion is trustworthy. Summary judgment is appropriate if the court determines that the data supporting the expert opinion is: (1) not relied upon by experts in the field; and (2) the sole and uncorroborated evidence proffered on a crucial issue such as causation. *See, e.g., In re "Agent Orange", supra,; Viterbo v. Dow Chemical Co.*, 646 F.Supp. 1420, 1424 (E.D.Tx.1986), *aff'd* 826 F.2d 420 (5th Cir.1987); *Lynch v. Merrell–National Laboratories*, 646 F.Supp. 856 (D.Mass.1986), *aff'd*, 830 F.2d 1190 (1st Cir.1987); *Richardson v. Richardson–Merrell, Inc.*, 857 F.2d 823 (D.C.Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 218, 107 L.Ed.2d 171 (1989) (judgment n.o.v. appropriate); *In re Paoli Railroad Yard PCB Litigation*, 706 F.Supp. 358 (E.D.Pa.1988), *rev'd* 916 F.2d 829 (3rd Cir.1990).[21] In determining whether the foundations of an expert opinion are sufficient, these courts have undertaken a detailed inquiry into the proffered testimony.[22]

The basis for this approach is the recognition that the court has a responsibility to make an independent determination of whether the bases for an expert's opinion meets "minimum standards of reliability."

---

**20.** The Eleventh Circuit has restated but not untangled the rule that "[a]lthough certain hearsay testimony by experts is permitted, it must be based on the type of evidence 'reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'" *United States v. Cox*, 696 F.2d 1294, 1297 (1983), *cert. denied* 464 U.S. 827, 104 S.Ct. 99, 78 L.Ed.2d 104 (1983) (excluding expert testimony not based upon "knowledge, skill, experience, training or education" but of a historical nature). "An expert's opinion that lacks any credible support does not create an issue of fact." *American Key Corp., v. Cole National Corp.*, 762 F.2d 1569, 1580 (11th Cir.1985) (citations omitted). The former Fifth Circuit addressed similar issues in cases such as *Bryan v. John Bean Div. of FMC Corp.*, 566 F.2d 541 (5th Cir.1978) (expert must use data complied in laboratory results and not conclusions of authors of such reports) and *Higgens v. Kinnebrew Motors, Inc.*, 547 F.2d 1223 (5th Cir.1977) (expert permitted to use Bureau of Statistics' tables as basis for opinion).

**21.** *Cf., In re Japanese Electronic Products Antitrust Litigation*, 723 F.2d 238 (3rd Cir.1983) (summary judgment inappropriate if the record contains unequivocal and uncontradicted evidence that the underlying data is of a type reasonably relied upon by experts in the field); *Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529 (D.C.Cir.), *cert. denied*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984); *Villari Terminix International, Inc.*, (E.D.Pa.1986).

**22.** Rule 104(a) requires a court to make a preliminary inquiry into the admissibility of expert testimony. *See, In re Agent Orange, supra.; In re Japanese Electronic Products Antitrust Litigation*, 723 F.2d 238, 260 (3d Cir.1983), *cert. granted*, 471 U.S. 1002, 105 S.Ct. 1863, 85 L.Ed.2d 157 (1985) (*In limine* rulings on admissibility appropriate even when not required by Rule 104).

Rule 703 permits experts to rely upon hearsay. The guarantee of trustworthiness is that it be of the kind normally employed by experts in the field. The expert is assumed, if he meets the test of Rule 702, to have the skill to properly evaluate the hearsay, giving it probative force appropriate to the circumstances. Nevertheless, the court may not abdicate its independent responsibilities to decide if the bases meet minimum standards of reliability as a condition of admissibility.

*In re Agent Orange*, 611 F.Supp. at 1245. In making the inquiry, Rules 102, 104(a), 401–403, 702–703 and 803(18) control.[23]

### 1. Preliminary Inquiry into the Admissibility of Novel Scientific Evidence.

As a preliminary matter, the court notes that, in addition to the general field of medicine, the parties rely on two fields of science to show causation. The parties have submitted evidence on epidemiology and human genetics.

The field of human genetics appears to offer novel scientific evidence. *United States v. Two Bulls*, 918 F.2d 56 (8th Cir. 1990). The defendant has submitted affidavits of Dr. Robert Gorlin[24] and Dr. Dorothy Warburton[25] containing evidence on genetic analysis and its application to this case. Dr. Gorlin offers information on ge-

netic mechanisms to show that it is highly improbable, if not impossible, that spermicide could cause a trisomy. *See, Affidavit of Dr. Gorlin*, ¶¶ 7–18.

Plaintiffs, through the deposition testimony Dr. Bussey and Dr. Holbrook, have also attempted to present information based upon the mechanisms of human genetics. Both doctors presented their theories as to how spermicide could cause a trisomy.

Although neither party addressed the issues surrounding the admissibility of evidence based upon the field of human genetics, the court, *sua sponte*, questions the admissibility of this evidence inasmuch as it appears to involve novel scientific evidence.[26] As Dr. Gorlin stated,

Human genetics is something of a johnny-come-lately in medical school ... To my knowledge, it is only within the past ten years that most medical schools have offered courses in this area.... [I]t was not until 1979 that the American Board of Medical Genetics, which serves to certify specialists in different areas of genetics, was established.

Thus, for purposes of admissibility under F.R.Evid. 102, the court must undertake a test enunciated in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923),[27] or the balancing test utilized in some of the other Circuits.[28] *See e.g., United States v.*

---

**23.** The Federal Rules of Evidence apply to summary judgment motions. *Weit v. Continental Illinois National Bank and Trust Co.*, 641 F.2d 457, 467 n. 38 (7th Cir.1981), *cert. denied*, 455 U.S. 988, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982).

**24.** Dr. Gorlin is considered by some to be one of the "fathers" of medical genetics in this country. *Affidavit of Barry L. Shapiro*, ¶ 2. Dr. Gorlin is presently Regents Professor and Chairman, Department of Oral Pathology and Genetics at the University of Minnesota. He also holds a joint appointment as Professor of Pediatrics, Professor of Obstetrics and Gynecology and Professor of Pathology at the same institutions. His specialty is genetics. He is a founding member of the American Board of Medical Genetics, one of the purposes of which is to certify specialists in the various areas of genetics. He is on the editorial board or a consultant for a number of journals focusing on genetics. *Affidavit of Dr. Gorlin*, ¶ 1.

**25.** Dr. Dorothy Warburton is Associate Professor of Clinical Pediatrics (in Genetics & Devel-

opment) at the College of Physicians and Surgeons, Columbia University. She has a Ph.D. in genetics from McGill University, Montreal, Canada. Since 1967 she has been Director of Genetics Services at St. Luke's Hospital which is associated with Columbia University.

**26.** Rule 104(a) of the Federal Rules of Evidence requires a court to make a preliminary inquiry into the admissibility of novel scientific evidence.

**27.** The *Frye* test requires that the proffered scientific evidence must have general acceptance in the scientific community.

**28.** *See, Rules for Admissibility of Scientific Evidence*, 115 F.R.D. 79 (1987); *Symposium on Science and the Rules of Evidence*, 99 F.R.D. 187 (1983); Gianelli, *The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half–Century Later*, 80 Colum.L.Rev. 1197 (1980).

*Downing,* 753 F.2d 1224 (3rd Cir.1985); *United States v. Williams,* 583 F.2d 1194, 1198 (2nd Cir.1978), *cert. denied,* 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979).

The Eleventh Circuit has "intimated" that federal evidence law does not require that the *Frye* test be met prior to the admission of novel scientific evidence.

> [T]his Court has intimated that federal evidence law does not require that the *Frye* test be met prior to the admission of evidence. *United States v. Hope,* 714 F.2d 1084, 1087 n. 3 (11th Cir.1983). This case, not concerning a federal conviction, presents us with no opportunity to address *Hope's* intimation.

*Bundy v. Dugger,* 850 F.2d 1402, 1421 n. 28 (11th Cir.1988), *cert. denied,* 488 U.S. 1034, 109 S.Ct. 849, 102 L.Ed.2d 980 (1989).

■ In keeping with F.R.Evid. 702's liberal attitude toward the admissibility of relevant expert testimony and the Eleventh Circuit's "intimation" in the *Hope—Bundy* decisions, the court will utilize the more recently accepted "balancing test." Under this approach, the evaluation of novel scientific evidence involves a balancing of the relevance, reliability, and helpfulness of the evidence against the likelihood of waste of time, confusion, and prejudice. *See, United States v. Downing,* 753 F.2d 1224 (3rd Cir.1985); *United States v. Williams,* 583 F.2d 1194, 1198 (2nd Cir.1978); *cert. de-*

*nied,* 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979).

The evidence provided on genetic mechanisms appears relevant inasmuch as the field of human genetics addresses itself to the study of gamete biology, the physiology of reproduction, and the effects of genetic mechanisms upon offspring. Since the cause of Crystal's birth defects is the central issue in this case, human genetics would appear to provide relevant information. Reliability is a factor more difficult to ascertain, particularly since neither party offered any challenge to the genetic evidence. In the absence of any conflicting evidence, the court deems the evidence on genetic mechanisms sufficiently reliable to be admitted and considered. It clearly would be helpful. Balanced against the likelihood of waste of time, confusion, or prejudice it is apparent to the court that the evidence should be both admitted and considered in this summary judgment motion.

■ The court finds that the submitted epidemiological studies do not involve novel scientific evidence.[29] Confronted with the reality of mass tort litigation, courts have been forced to abandon their traditional reluctance to rely upon epidemiological studies.[30] Epidemiological studies have been relied upon in federal litigation to a degree that epidemiology cannot be considered a novel theory.[31] Thus, for pur-

---

**29.** The court is aware that some debate the propriety of admitting epidemiological evidence. *See, e.g.,* Black & Lilienfeld, *Epidemiologic Proof in Toxic Tort Litigation,* 52 Fordham L.Rev. 732, 762–64 (1984); Dore, *A Commentary on the Use of Epidemiological Evidence in Demonstrating Cause-in-Fact,* 7 Harv.Envtl.L.Rev. 429 (1983); Hall & Silbergeld, *Reappraising Epidemiology: A Response to Mr. Dore,* 7 Harv. Envtl.L.Rev. 441 (1983); Comment, *Epidemiologic Proof of Probability: Implementing the Proportional Recovery Approach in Toxic Exposure Torts,* 89 Dick L.Rev. 233 (1984). The court is convinced that the debate should not be over the admissibility of epidemiological evidence but the proper evaluation of such evidence. *See, e.g.,* Large & Michie, *Proving that the Strength of the British Navy Depends on the Number of Old Maids in England: A Comparison of Scientific Proof with Legal Proof,* 11 Envtl.L. 555 (1981).

**30.** *See, e.g.,* Black & Lilienfeld, *Epidemiologic Proof in Toxic Tort Litigation,* 52 Ford.L.Rev.

732, 744–749 (1984) (case examples). Several courts have found epidemiological studies conducted by the government sufficiently trustworthy. For example, the Fourth Circuit, in *Ellis v. International Playtex, Inc.,* 745 F.2d 292 (4th Cir.1984), held that epidemiological studies of toxic shock syndrome conducted by three state health departments and the Federal Centers for Disease Control were admissible under Rule 803(8)(C). The court noted that these studies utilized "uniform procedures and methods that are widely accepted by their peers" and were carried out in a timely and impartial manner. *Id.* at 301.

**31.** Several courts have relied upon epidemiological evidence to resolve issues of causation of defect, illness, or disease. In the swine flu cases, several courts held that, in the absence of either epidemiological evidence or a scientific understanding of causation, any liability based on causation must be rejected as speculative. *See, e.g., In re Swine Flu Immunization Products*

poses of admissibility under F.R.Evid. 102, the court need not undertake the balancing test for the epidemiological evidence.

2. Is the Evidence of a Kind Relied Upon by Experts in the Medical Field?

In product liability cases such as this, experts are often necessary to assist the trier of fact in determining the legal or proximate cause of plaintiffs' alleged injuries. The opinions of plaintiffs' experts provide the only evidence that Conceptrol was the proximate cause of Crystal's malformations.

Federal Rule of Evidence 703 provides that the facts or data, upon which expert witnesses rely in forming their opinions, need not be admissible in evidence if they are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."

In cases involving birth defects, the data relied upon by experts in the medical field comes from the fields of genetics, epidemiology, and teratology and consists primarily of genetic studies, epidemiological studies and physical examination of the parents and affected children.[32]

Defendant concedes that epidemiological and genetic studies are the type of data utilized by experts in the field. However, defendant alleges that the experts' selection and use of the epidemiological data is faulty and thus provides an insufficient basis upon which experts in the field of diagnosing the source of birth defects normally form their opinions. The defendant also contends that the plaintiffs' experts' data on genetics is not of the kind reasonably relied upon by experts in field of determining causation of birth defects.

3. Is There a Sufficient Basis for the Expert Testimony?

Both parties seek to put a "spin" on the law governing the court's examination of expert witness testimony. Plaintiffs assert that the court should completely defer to the expert's competence in determining the sufficiency of the basis of expert testimony.

The court agrees that part of the rationale underlying Rule 703 is the concept "that the expert, because of his professional knowledge and ability, is competent to judge for himself the reliability of the records and statements upon which he bases his expert opinion." *United States v. Williams*, 447 F.2d 1285, 1290 (5th Cir. 1971), *cert. denied*, 405 U.S. 954, 92 S.Ct. 1168, 31 L.Ed.2d 231 (1972); *See generally Payton*, 780 F.2d at 156; *Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529, 1535–36 (D.C.Cir.1975), *cert. denied*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984).[33]

Defendant, on the other hand, argues that the court should defer to the judgment of defendant's proffered experts regarding whether a particular journal article provides adequate support for plaintiffs' case or whether a particular methodology is flawed. Defendant presents affidavits from its expert witnesses which critique the deposition testimony of Drs. Bussey and Holbrook and conclude that plaintiffs' proffered expert opinions lack a sufficient basis in genetics and epidemiology to determine the cause of Crystal Smith's birth defects.

---

Liability Litigation, *508 F.Supp. 897, 907 (D.Colo.1981)* ("[w]here ... the exact organic cause of a disease cannot be scientifically isolated, epidemiologic data becomes highly persuasive."), aff'd sub nom., *708 F.2d 502 (10th Cir.1983);* Terrell v. United States, *517 F.Supp. 374, 379 (N.D.Tex.1981). Epidemiological studies on causation also played a decisive role in the "Agent Orange" litigation.* In re "Agent Orange", *611 F.Supp. 1223 (E.D.N.Y.1985). In that litigation, Judge Weinstein found that a number of epidemiological studies were the only useful evidence having any bearing on causation* id. *at 1231. Similar epidemiological studies were also decisive in the litigation over Bendectin.* Lynch v. Merrell–National Laborato-

ries, *646 F.Supp. 856 (D.Mass.1986),* aff'd, *830 F.2d 1190 (1st Cir.1987).*

**32.** The parties in this case agree that an examination of Crystal offers no probative evidence on the cause of her defects.

**33.** Or as Judge Weinstein has stated, "[i]n making this inquiry the court may inquire into the relevance of the data relied on as well as it reliability ... but deference ought to be accorded to the expert's view that experts in his field reasonably rely upon such sources of information." *In re Agent Orange*, 611 F.Supp. at 1242, citing, *Greenwood Utilities v. Mississippi Power Co.*, 751 F.2d 1484, 1495 (5th Cir.1985).

██ The court cannot unjustifiably defer to any expert's assertion that a particular proffered opinion has a basis in fact. Although a court should generally defer to an expert's assessment that the basis of his opinion is of a type reasonably relied upon by experts in his field, Rule 703 requires that the court make the ultimate determination—especially when there is evidence to the contrary. There must be some reliable factual basis upon which the opinions of plaintiffs' experts are premised.

> If the underlying data is so lacking in probative force and reliability that no reasonable expert could base an opinion on that data, then an opinion which rests entirely upon that data must be excluded.

*Viterbo v. Dow*, 646 F.Supp. at 1424, *citing, In re Agent Orange*, 611 F.Supp. at 1245. Thus, if there is a lack of reliable factual basis for an expert opinion, experts on actual cause should be barred from giving their opinions on proximate cause.[34] As one court stated,

> A rigorous examination [of the basis of the expert's opinion] is especially important in the toxic tort context, where presentation to the trier of theories of causation depends almost entirely upon expert testimony. This examination is required because courts have afforded experts wide latitude in picking and choosing the sources on which to base opinions.

*Viterbo v. Dow*, 646 F.Supp. at 1424.

██ The court will examine whether the experts' conclusions lack a sufficient basis in the use of epidemiological and genetic data.[35] The admissibility of their proposed testimony will turn on the reliability of the genetic and epidemiological data and the experts' ability to evaluate the data properly to determine whether there is a causal relationship between spermicide and trisomy–18.

### A. The Epidemiological Studies.

Epidemiology is the medical science that evaluates the distribution and causes of disease and birth defects by studying their patterns in populations.[36] Epidemiology is based on the study of populations, not individuals.[37] It seeks to establish associations between suspected causes and effects by one of two methods: either comparing the incidence of disease or birth defects across exposed and unexposed populations, or comparing the incidence of exposure across sick and healthy populations. With proper scientific interpretation, these correlations provide an inference of causation. However, in an individual case, epidemiology cannot conclusively prove causation; at best, it can only establish a certain probability that a randomly selected case of disease was one that would not have occurred absent exposure, or the 'relative risk' of the exposed population. Epidemiology, therefore, involves evidence on causation derived from group-based information, rather than specific conclusions regarding causation in an individual case.

Epidemiology is one of the standard scientific techniques for studying the effects

---

**34.** It should be noted that experts must ground their opinions on verifiable propositions of fact in commercial cases as well as tort actions. *See, e.g., DiRose v. PK Management Corp.*, 691 F.2d 628 (2d Cir.1982), *cert. denied*, 461 U.S. 915, 103 S.Ct. 1896, 77 L.Ed.2d 285 (1983).

**35.** Plaintiffs' experts have conceded that alternative evidence, such as animal studies, are not probative in this case. *Deposition of Dr. Bussey*, pp. 124–125.

**36.** Epidemiological studies rely on "statistical methods to detect abnormally high incidence of disease in a study population and to associate those incidence with unusual exposures to suspect environmental factors." Done, *A Commen-*

*tary on the Use of Epidemiological Evidence in Demonstrating Cause–In–Fact*, 7 Harv.Envtl. L.Rev. 429, 431 (1983) *cited in Lynch v. Merrell–National Laboratories*, 646 F.Supp. 856, 863 (D.Mass.1986), *aff'd*, 830 F.2d 1190 (1st Cir. 1987).

**37.** J. Mausner & A. Bahn, *Epidemiology* 4 (1974) ("epidemiology is concerned with ... illnesses and injuries in groups of people"); Black & Lilienfeld, *supra* note 29, at 755; Muir & Higginson, *Role of Epidemiology in Identifying Chemical Carcinogens*, in *Handbook of Carcinogen Testing* 28 (H. Milman & E. Weisburger, eds.1985). As discussed below, case studies do focus on individual cases but always in the context of a group.

of drugs on fetuses. Both parties agree that published articles and epidemiological studies in reputable medical journals are the type of data upon which experts in the field rely in forming their opinions. The majority of published scientific studies addressing whether spermicide causes trisomy are epidemiological investigations. Plaintiffs' experts state that they have relied on their study of medical literature on the question at issue and, in the case of Dr. Bussey, an examination of Crystal Smith in reaching their conclusions.[38]

There are two basic types of epidemiological studies. One type is termed a prospective or cohort study. The other is referred to as a retrospective or case-control study.[39] "Cohort" studies are those in which the incidence of birth defects among groups of persons exposed to a particular chemical or drug and groups of persons not exposed are compared. "Case control" studies start with a group of persons who have the birth defects in question ("cases"), match this group with another group (the "controls") not having the birth defects in question, and compare the frequency of exposure to the chemical or drug among the cases and the controls. *Lynch v. Merrell–National Laboratories*, 646 F.Supp. at 863. In either type of study, two groups of pregnant women, only one of which was exposed to the drug under study, are compared to see if there is a meaningful difference, based on statistical tests, in the outcomes of their pregnancies.

Generally, in a cohort study, researchers know what the mothers were exposed to at or about the time of conception and before they know the outcome of the pregnancy; hence, the prospective designation. In the case-control study, by contrast, researchers obtain information concerning what the mother might have been exposed to at or about the time of conception after they know the pregnancy outcome; hence, the retrospective designation. Comparisons are then made using established mathematical or statistical conventions to determine whether there is any meaningful difference in the things to which mothers of children with birth defects were exposed as compared to mothers of children without defects. The objective of both case-control and cohort studies is to determine whether the difference observed in the two groups, if any, is "statistically significant," (that is whether the difference found in the particular study did not occur by chance alone).[40]

However, statistical methods alone, or the finding of a statistically significant association in one study, do not establish a causal relationship.[41] As one authority states:

> Statistical methods alone cannot establish proof of a causal relationship in an association.[42]

As a result, once a statistical association is found in an epidemiological study, that data must then be evaluated in a systematic manner to determine causation. If such an association is present, then the

---

**38.** The court considers Dr. Bussey's examination of Crystal to be of little probative value. Dr. Bussey testified that, prior to her examination, he had never personally seen another case of trisomy–18 and that the examination was not necessary for him to form an opinion as to the etiology of her birth defect. *Bussey Deposition*, p. 24.

**39.** See, A. Lilienfeld, *Foundations of Epidemiology* 14 (1976). These studies encompass a variety of subtly different experimental designs requiring different techniques of analysis. *See, id.* at 164–229.

**40.** In the case-control study, the accuracy of the information concerning "exposure" to the substance being investigated is critical to the reliability of the study, particularly one involving birth defects. *Mills Affidavit*, ¶ 8.

**41.** *See, e.g., Smoking and Health Report of the Advisory Committee of the Surgeon General of the Public Health Service*, 19–21 (1964); L. Breslow, *Cigarette Smoking and Health*, Landmarks in American Epidemiology, 95:451, 452 (1980) ("Stating the probability that an association is 'significant' according to some statistical convention is merely the first important technical step in a difficult process. Drawing conclusions from epidemiologic studies begins, does not end, there."); J. Fox, C. Hall & L. Elveback, *Epidemiology*, 306–307 (1970) ("statistical methods cannot establish proof of a causal relationship in an association.")

**42.** R. Morton & J. Hebel, *A Study Guide to Epidemiology and Biostatistics*, 120 (1984).

researcher looks for "bias" in the study. Bias refers to the existence of factors in the design of a study or in the manner in which the study was carried out which might distort the result.[43]

If a statistically significant association is found and there is no apparent "bias," an inference is created that there may be a cause-and-effect relationship between the agent and the medical effect. To confirm or rebut that inference, an epidemiologist must apply five criteria in making judgments as to whether the associations found reflect a cause-and-effect relationship.[44] The five criteria are:

1. The consistency of the association;
2. The strength of the association;
3. The specificity of the association;
4. The temporal relationship of the association; and,
5. The coherence of the association.

Assuming there is some statistical association, it is these five criteria that provide the generally accepted method of establishing causation between drugs or chemicals and birth defects.[45] Although researchers disagree as to the individual importance of each of the five criteria, these five criteria, have reached the status of being latter-day postulates of causation. They have often been invoked as the standards to be employed for drawing conclusions or making policy decisions about the etiology of chronic disease.[46]

The first criterion, "consistency," means that different studies resulted in the same association even though they employed different designs and were conducted on different populaces. In other words, consistency is the equivalent of replication.[47] The criterion rests on a basic principle of logic and science, namely, that if a causal relationship exists, it will be repeated in later studies; if the relationship is not real or is a mere matter of chance, it will not be repeated. Because replication is important in ascertaining the reliability of data, almost all researchers agree that "consistency" is one of the most important of the criteria.[48]

"Strength" of the association refers to the size of the risk found in a given study. For example, in a prospective study, the incidence of the birth defect in the exposed group indicates how frequently the defect occurs following exposure to the agent. The greater the risk, the more convincing it is that the association is causal.[49]

43. An example of bias would be an improper definition of exposure to the agent being studied. A common type of related bias that infects retrospective case-control studies is known as "maternal recall bias" which refers to the assumption that women with malformed children will, when they think back, tend to recall what they were exposed to during pregnancy differently than women with non-malformed children. *Mills Affidavit,* ¶ 23.

44. The five criteria were initially defined in 1964 by the Advisory Committee to the Surgeon General of the Public Health Service. These criteria were evaluated by the Advisory Committee in preparation for the 1964 report on "Smoking and Health" which has become a seminal document for the study of the causes of disease and birth defects. *See, supra,* note 44.

45. Where litigants are using data from a particular discipline, the law holds that the principles of that discipline must be used in evaluating the data. *Moultrie v. Martin,* 690 F.2d 1078, 1082 (4th Cir.1982) ("In borrowing from another discipline, a litigant cannot be selective in which principles are applied.")

46. A.R. Feinstein, *Clinical Biostatistics: Scientific Standards vs. Statistical Associations and*

*Biologic Logic in the Analysis of Causation,* Clinical Pharmacology and Therapeutics, (April 1979). This article provides a thoughtful analysis of these criteria but charges that epidemiologists have failed to be more careful and critical in their gathering and use of the raw data upon which the statistical associations or non-associations are made.

47. *Mills Affidavit,* ¶ 18.

48. *Mills Affidavit,* ¶ 18; *Deposition of Dr. Bussey,* pg. 83, lines 23–25; *Deposition of Dr. Holbrook,* pg. 40, lines 2–4.

49. *Mills Affidavit,* ¶ 19. In addition to calculating whether or not a statistically significant increased association between the agent and the effect being studied, epidemiologists often calculate confidence intervals around the risk or association found. An understanding of confidence intervals and their use is critical to determining what weight can be ascribed to the study where the results show a relative risk greater than 1.0. Confidence intervals help indicate whether the population in a given study was large enough to provide sufficient statistical power to determine the true relative risk. "Rel-

"Specificity" measures the degree to which exposure to the particular drug or other substance at issue produces one specific disease or syndrome of effects. If the biological response to the exposure is variable, it is thought less likely to be causal.

The fourth criterion, "temporal relationship," means exposure to the factor must precede development of the disease. The final criterion, "coherence of the association" considers whether it is biologically possible for the agent being studied to cause the disease or other effect at issue. This factor is usually explored through animal tests.[50]

This somewhat extensive review of epidemiological methodology was necessary, first, to illustrate the nature of the epidemiological evidence that the court must examine and apply to Crystal's case, and secondly, to address defendant's contention that the studies relied upon by plaintiffs provide an insufficient basis for an expert opinion.[51]

The court notes that, in an individual case, epidemiology cannot conclusively prove causation; at best, it can establish only a certain probability that a randomly selected case of birth defect was one that would not have occurred absent exposure (or the 'relative risk' of the exposed population). Because epidemiology involves evidence on causation derived from group-based information, rather than specific conclusions regarding causation in an individual case, epidemiology will not conclusively prove or disprove that an agent or chemical causes a particular birth defect. Instead, its probative value lies in the statistical likelihood of a specific agent causing a specific defect. If the statistical likelihood is negligible, it establishes a reasonable degree of medical certainty that there is no cause-and-effect relationship absent some other evidence.

There are numerous epidemiological studies in which researchers have considered the teratogenicity of spermicides. Plaintiffs' experts rely on four early epidemiological studies showing a likely association between spermicide and trisomy. They are Oechsli (1976), Jick (1981); Strobino/Warburton (1980, 1986) and Rothman (1982).

Defendant seeks to show that these studies would not be reasonably relied upon by experts in the field for determining whether spermicide could cause trisomy–18.

### 1. The Jick (1981) Study.

The first epidemiological study which reported that there might be an increased risk for births with congenital defects was the Jick (1981) study.[52] Jick, "Vaginal Spermicides and Congenital Disorders," *Journal of the American Medical Associa-*

---

ative risk" is simply the ratio of the incidence of disease in the exposed population to the incidence of disease in the non-exposed population.

For example, if a birth defect occurs only once in 1000 births in the general population, then a prospective study in which only 100 persons are exposed will on the average be able to detect only a very powerful agent, one that increases the incidence more that 10-fold. Hence, there is a considerable difference between saying that a drug is "safe" and saying that a drug has not been shown to cause birth defects. The larger group studied increases the confidence in the results of the study. If the confidence interval includes unity, or 1.0, which means no risk, then traditional epidemiological conclusions are that the point relative risk or association found, no matter how large, is not significantly different from 1.0 or no risk. *See,* G.P. Oakley, *Drug Influences on Malformations,* 6 Clinics in Perinatology, 403, 405 (1979).

50. The parties agree that there have been no animal studies that provide reliable data from which one could conclude that spermicides cause chromosomal damage in animals. *Bussey Deposition,* p. 124.

51. Much of the information on epidemiological methodology was provided by defendant in its brief for summary judgment. The plaintiff neither provided information on epidemiology nor objected to defendant's presentation. Nevertheless, the court reviewed the relevant literature to determine whether defendant's information was sufficiently accurate and comprehensive to provide assistance to the court in its determination. The court found defendant's presentation to be accurate and complete.

52. A number of epidemiological studies were published prior to the Jick (1981) study which found no association between spermicide and birth defects. *See, e.g.,* Poland (1970), Smith (1977), Heinonen/Shapiro (1977), Janerich (1980), and Harlap (1980).

*tion,* Apr. 3, 1981, at 1329.[53] The defects addressed in the study included limb defects, chromosome anomalies (*i.e.,* trisomy–21), hypospadias, and neoplasms.

The authors of the Jick study admitted there were several problems with the study.[54] One problem was that women who had received prescriptions for spermicide up to 600 days before delivery had, in fact, used the spermicide at or about the time of conception. The average prescription for spermicide does not last that long. Thus, the study had a poor definition of exposure.[55]

A second problem was that the study revealed no well-defined syndrome among babies with congenital disorders whose mothers had used spermicide. Consequently, the specificity criteria, which would indicate the degree to which exposure to nonoxynol–9 results in trisomy–18, would be lacking. Since the biological response to the exposure varied in the study, it is less likely to show that nonoxynol–9 causes trisomy–18. Because of this factor, the authors suggested that the results of this study should be considered tentative until confirmed by other data.

The study concluded that:

The absence of a single, well-defined syndrome among the infants whose mothers used spermicides raises doubt about a causal connection between these agents and the disorders noted. In addition, we believed that we could not determine reliably, so long after the fact, when the mothers of the affected infants had actually used spermicides in relation to the time of conception. Thus the precise time of exposure has not been established.... Therefore, despite the association found, the current study leaves a number of important questions unanswered, and the results should be considered tentative until confirmed by other data.

*Id.,* at 1332.

One of the authors of the Jick (1981) study, Dr. Richard Watkins, reviewed the underlying data and published the results of his reexamination of the data in "Vaginal Spermicides and Congenital Disorders: The Validity of a Study," 256 *Journal of the American Medical Association,* December 12, 1986, at 3095. Dr. Watkins concluded,

These data indicate that our [*i.e.,* the Jick (1981) ] study's definition of exposure to spermicide near the time of conception was grossly inaccurate and that its conclusion is unsupported by more complete evidence from its subjects.[56]

## 2. The Rothman (1982) Study.

A co-author of the Jick (1981) study conducted another epidemiological study relied upon by plaintiffs: K.J. Rothman, "Spermicide and Down's Syndrome," 72 *American Journal of Public Health* 399 (1982). That

---

**53.** The Jick study played a key evidentiary role in the *Wells* litigation.

**54.** The court also notes several problems with this study. First, is the question of the probative evidentiary value, even when used by an expert, of the study on the issue in this case. Only 20% of the women in the study had used spermicide containing nonoxynol–9, the active agent in Conceptrol. Second, there was only one case of trisomy–18 in the study and that case was found among one of the controls; that is, a woman who had *not* used spermicide.

**55.** There is also a flaw in the data used to determine exposed or non-exposed women. In July, 1987, Dr. James Mills and his colleagues at the National Institute of Health re-analyzed the data used in the Jick (1981) study. They re-classified those women who had planned pregnancies as nonusers. These women had origi-

nally been classified as "spermicide users" despite the obvious incongruity. As a result of the re-analysis, Dr. Mills and his colleagues concluded that the malformation rate in offspring of women who probably were exposed to spermicide during pregnancy is not statistically significantly higher than the rate in offspring of non-exposed women. *Affidavit of Dr. James L. Mills.* Exhibit 10.

**56.** Dr. Lewis Holmes, another co-author of the Jick (1981) study also re-emphasized the study's limitations in a letter to the editor of the Journal of the American Medical Association. He stated:

In retrospect, I believe that we did not have enough information to warrant publication and that the effect of the article has been more harmful than beneficial.

256 *Journal of the American Medical Association* 3096 (1986).

study found an association between spermicide use and Down's Syndrome (trisomy–21). The data used for this study was originally collected for a previous study on possible associations between oral contraceptives and congenital heart disease.[57] Rothman's study was a case control study that included among the subjects 16 infants with Down's syndrome. The estimated ratio of the proportion of Down's syndrome births among spermicide users to the proportion in non-users was 3.6 with a 90 per cent confidence interval of 1.2 to 9.0, thus providing a tentative confirmation of the association between spermicide and trisomy–21. The author of the study states that the results suggest no more than a "tentative confirmation of a link." [58]

### 3. The Strobino/Warburton (1980, 1986) Studies.

Dr. Bussey states that, in forming his opinion regarding causation, he relies on a 1980 abstract of a study conducted by Drs. B. Strobino and D. Warburton and others whose preliminary finding indicated a statistically significant association between spermicide use for more than a year and nonviable trisomies. Strobino, *et al., Exposure to Contraceptive Creams, Jellies and Douches and Their Effect on the Zygote,* 112 Am.J.Epidemiol. 434 (1980). This publication was an abstract of a retrospective study of spontaneous abortions. The authors,

> observed a significant excess of post conception errors, errors in the division of the zygote that occur immediately after fertilization, in the exposed group.

The abstract ended with the assertion that, "[t]his is the first example in humans of an

immediate and direct effect on the chromosomes of the zygote that could be attributed to a chemical exposure." *Id.*

An evaluation of the abstract indicates that it does not include sufficient data to enable a reviewer to independently evaluate the conclusions of the study. Thus, a reviewer would be unable to estimate its value.[59] Moreover, this particular study concerned nonviable trisomies (trisomy–16 generally resulting in spontaneous abortions) rather than birth defects. Likewise, it was not limited to nonoxynol–9 but included "any type of chemical agent intended to kill sperm."

Dr. Bussey also relies upon a 1986 study which was a replication on a larger scale of the study reported in the abstract and resulted in a different conclusion. B. Strabino, *et al., Vaginal Spermicides and Spontaneous Abortion of Known Karyotype,* 123 American Journal of Epidemiology 431 (1986). This study finds an association between spermicide use and nonviable trisomies where women had used spermicide for more than a year. However, as the authors noted, the association was an "uncertain" one, and could have been a "chance [statistical] finding." Likewise, the association was limited to those involving trisomy–16 and other nonviable trisomies. No association was found between viable trisomies, such as trisomy–18, and spermicide use.

### 4. The Oechsli (1976) Study.

Plaintiffs also rely upon a study conducted pursuant to a grant of the NIH, Oechsli, *Studies of the Consequences of Contraceptive Failure* (Apr. 8, 1976).[60] The study was based upon a group of women and

---

57. K.J. Rothman, *et al., Exogenous Hormones and Other Drug Exposures of Children with Congenital Heart Disease,* 109 American Journal of Epidemiology 433 (1979).

58. The court also notes several evidentiary problems with this study. First, the study did not address trisomy–18, the injury in this case. Secondly, the data collected resulted from the question: "Did you use any type of birth control measure other than pills during the period before this pregnancy?" The study focused on those children with Down's syndrome and congenital heart disease. As discussed above, in a case-control study the findings depend upon the

control population used for comparison and may be affected by recall bias.

59. Dr. Mills has testified that, for these reasons, abstracts are generally not relied upon by researchers in this field. *Mills Affidavit,* ¶ 28.

60. The study was the *Final Report for Contract NO1–HD–5–2816* for the Contraceptive Evaluation Branch, Center for Population Research, National Institute of Child Health and Development. The author was Frank W. Oechsli, Ph.D., of the School of Public Health at the University of California, Berkeley.

data gathered between 1959 and 1966 from the Kaiser–Permanente Medical Center. The author reported no clear association between spermicide use and chromosomal abnormalities. However, he did find a statistical association between spermicide use and certain ill-defined congenital heart defects which he considered,

> either 'statistically significant' ... or approaching significance, [b]ut the significance levels are clearly nominal and not to be taken at face value.

He could not replicate his finding for black women in the study nor in a subgroup of women who used spermicide and a diaphragm.

The study did not specifically address nonoxynol–9 and trisomy. Moreover, the study was never published and thus lacks peer review. A scientific study not subject to peer review has little probative value. *Perry v. United States*, 755 F.2d 888, 892 (11th Cir.1985); *Lynch v. Merrell-National Laboratories*, 646 F.Supp. at 859.

Dr. Bussey relies upon certain findings in the aforementioned epidemiological studies for his opinion that Ortho's product caused Crystal's trisomy. He also states that he relies upon later studies which defendant and its experts have relied on. These later epidemiological studies conclude that there is no association between spermicide and trisomy. They are Polednack (1982) [61]; Shapiro (1982) [62]; Mills (1982) [63]; Bracken (1983) [64]; Cordero (1983) [65]; Linn (1983) [66]; Harlap (1985) [67]; Mills (1985) [68]; Warburton (1987) [69]; and Louik (1987).[70] All of these later studies show no statistical association between nonoxynol–9 and trisomy–18.

Despite the findings of the later studies, Dr. Bussey stated that the Louik (1987) and Warburton (1987) [71] studies made him "more certain" that the spermicide caused the trisomy in this case than "he had been with the previous data." *Bussey Deposition*, pp. 321–322. Although he admitted that the studies demonstrated no association between spermicide use and trisomy, he could not discern any flaws in the de-

**61.** A. Polednack, D.T. Janerich & D.M. Glebatis, *Birth Weight and Birth Defects in Relation to Maternal Spermicide Use*, 26 Teratology 27 (1982).

**62.** S. Shapiro, *et. al., Birth Defects and Vaginal Spermicides*, 247 J.A.M.A. 2381 (1982).

**63.** J.L. Mills, E.E. Harley, G.F. Reed & H.W. Berendes, *Are Spermicides Teratogenic?* 248 J.A.M.A. 2148 (1982).

**64.** M.B. Bracken, K. Vita, *Frequency of Non–Hormonal Contraception around Conception and Association with Congenital Malformations in Offspring*, 117 Am.Jnl. Epidemiology 281 (1983).

**65.** J.F. Cordero and P.M. Layde, *Vaginal Spermicides, Chromosomal Abnormalities and Limb Reduction Defects*, 9 International Family Planning Perspectives, 15 (1983).

**66.** S. Linn, *et al., Lack of association between contraceptive usage and congenital malformations in offspring*, 147 Am.J.Obstet.Gynecol. 923 (1983).

**67.** S. Harlap, *et al., Chromosomal Abnormalities in the Kaiser-Permanete Birth Defects Study, with Special Reference to Contraceptive Use Around the Time of Conception*, 31 Teratology 381 (1985).

**68.** J.L. Mills, *et al., Are there adverse effects of periconceptional spermicide use?*, 43 Fertility and Sterility 442 (1985).

**69.** D. Warburton, *et al., Lack of Association Between Spermicide Use and Trisomy*, 317 The New England Journal of Medicine 478 (1987).

**70.** C. Louik, *et al., Maternal Exposure to Spermicides in Relation to Certain Birth Defects*, 317 The New England Journal of Medicine 474 (1987).

**71.** D. Warburton, *et al., Lack of Association Between Spermicide Use and Trisomy*, 317 The New England Journal of Medicine 478 (1987). An evaluation of this study indicates that it also lacks certain probative value for this case. First, the vast majority of the women in the case-control sample, 77.6 percent of the women, used a cream or foam type of spermicide designed to be used with a diaphragm. Conceptrol, the spermicide being litigated here, is designed to be used alone. Second, the focus on the study was trisomy–21 rather than trisomy–18. The study found no association between viable trisomies, such as trisomy–18, and spermicide use. Third, the authors' evaluation of their results,

> show no association between the occurrence of trisomy and maternal use of spermicide, as measured either by the duration of exposure or by the proximity of last use to pregnancy.

sign or calculations of either of the studies and did not attempt to recalculate any of the data used in the studies.

Dr. Bussey testified that he has no methodology for arriving at his conclusions.[72] An extensive review of Dr. Bussey's deposition conclusions reflect speculation and the fact that he is not familiar with basic principles used in evaluating epidemiological studies.[73] The court cannot help but to conclude that the basis of his expert testimony is not that which experts in determining birth defects reasonably rely upon.

### B. *The Genetic Evidence.*

The normal human cell has a complement of 46 chromosomes or one pair of each of the 22 numbered chromosomes plus some combinations of the X and Y chromosomes. The various chromosomes, while sharing certain attributes, have different characteristics and a separate number designates each chromosome. Following a process of cell division known as meiosis, the reproductive cells or gametes (*i.e.*, the sperm and the egg) end up with 23 chromosomes each (*i.e.*, one each of the 22 numbered chromosomes plus an X or a Y chromosome). This means that at the time of fertilization, when the egg and the sperm combine, the product of conception or offspring should have 46 chromosomes. An individual with trisomy has an extra chromosome. A cytogenetic study shows that Crystal has three number–18 chromosomes, rather than the normal complement of two. Thus, she has been diagnosed as having Trisomy–18.

Trisomy reflects an imbalance in the number of chromosomes rather than damage to a particular chromosome.[74] The imbalance results, in the majority of cases, from what is called non-disjunction, namely an unequal division of the chromosomal material during meiosis.[75] The extra chromosome found in the offspring can be passed on by either parent.

Three to six percent of children born have malformations of some sort.[76] No one knows the cause of 60–70% of most birth defects.[77] But 20–25% are due to genetic factors. Trisomies are the most commonly occurring chromosomal abnormality among clinically recognizable pregnancies, accounting for at least 4% of all such conceptions.[78] Trisomy may occur spontaneously without exposure to any known teratogen,[79] but the most common risk factor, which has been consistently shown to be associated with trisomy and the accompanying malformations, is advanced maternal age.[80]

Plaintiffs contend that Crystal's malformations were caused not by her mothers advanced age at conception, but by the vaginal spermicide which Crystal's parents were using at the time of Crystal's conception. They offer Dr. Holbrook for an expert opinion on how Conceptrol "mechanistically" has the potential and is capable of causing trisomies in infants born of mothers who use spermicides.

Dr. Holbrook offers three mechanisms by which spermicides could potentially cause trisomy: 1) damage to the sperm cell, 2) damage to the ova, and/or 3) dam-

---

*Id.*, p. 481.

72. Dr. Bussey testified in deposition:
   Q: Do you have a methodology or protocol for reaching determinations as to whether a particular agent is a human teratogen?
   A: No.
   *Bussey Deposition*, p. 83.

73. For instance, in reference to distinctions in the data between viable and nonviable trisomies, Dr. Bussey testified to his assumption that "you just have to subject it to whatever interpretation you would like to." *Bussey Deposition*, p. 329.

74. *Deposition of Dr. Holbrook*, pg. 207, lines 16–19.

75. *Gorlin Affidavit*, ¶ 5.

76. Beckman & Brent, *Mechanism of Known Environmental Teratogens: Drugs and Chemicals*, 13 Clinics in Perinatology 649, 652 (1986).

77. *Bussey Deposition*, p. 60. *Mills Affidavit*, ¶ 12.

78. *Gorlin Affidavit*, ¶ 6.

79. Teratology: "The science or study of ... abnormal formations in animals or plants." *The Random House College Dictionary*, (Rev. ed.) p. 1355.

80. *Bussey Deposition*, p. 216; *Gorlin Affidavit*, ¶ 13.

age to product of conception. He offers broad theoretical propositions as to how birth defects "might" be produced by spermicide. He is willing to testify that, in order to cause a trisomy, there must be some type of damage to either the DNA, the messenger RNA, the transfer RNA or some cytoplasmic function that alters the outcome of the replication of the DNA. *Holbrook Deposition*, p. 237. However, in deposition he testified,

Q: Can you state what, if anything, is damaged when the egg is exposed to spermicide which would result in a trisomy–18?

A: No.

Q: Can you state what, if anything, is damaged when the sperm is exposed to spermicide that would result in a trisomy–18?

A: Specifically, no.

Q: Okay. And the same question for the product of conception. Can you state what, if anything, is damaged when the product of conception is exposed to spermicide which would result in a trisomy–18?

A: No specifically, no.

Q: Okay. Other than the epidemiologic studies which have suggested these three mechanisms which you have listed, do you have any other opinion as to how in fact, a trisomy would result from spermicide exposure?

A: No.

*Deposition of John M. Holbrook, Ph.D.*, p. 286.

Dr. Holbrook also relies on epidemiological data, primarily the Jick (1981) study, to support his theoretical genetic mechanisms. The court need not re-address the deficiencies in that basis.

It is apparent to the court that the testimony of Doctors Bussey and Holbrook is insufficiently grounded in any reliable evidence. Framing their testimony as a hypothetical does not defeat the need for an adequate basis. *Cunningham v. Rendezvous, Inc.*, 699 F.2d 676, 678 (4th Cir.1983). The conclusions Doctors Bussey and Holbrook reach are also insufficient as a basis for a finding of causality because they fail to consider critical information, such as the most relevant epidemiologic studies and the other possible causes of disease.[81]

The court finds that the opinions of plaintiffs' experts are not based upon the type of data reasonably relied upon by experts in determining the cause of birth defects. Experts in determining birth defects rely upon a consensus in genetic or epidemiological investigations or specific generally accepted studies in these fields. While a consensus in genetics or epidemiology is not a prerequisite to a finding of causation in any and all birth defect cases, Rule 703 requires some reliable evidence for the basis of an expert's opinion.

Experts in determining birth defects also utilize methodologies and protocols not followed by plaintiffs' experts. Without a well-founded methodology, opinions which run contrary to the consensus of the scientific community and are not supported by any reliable data are necessarily speculative and lacking in the type of foundation necessary to be admissible.

For the foregoing reasons, the court finds that plaintiffs have failed to produce admissible evidence sufficient to show that defendant's product caused Crystal's birth defects.

## V. MOTION TO STRIKE AFFIDAVITS

Plaintiffs move to strike certain affidavits submitted by the defendant. In the July 11, 1988 hearing the court permitted the affidavits to be filed. This court generally does not entertain motions to strike affidavits. As Judge O'Kelley explained in *Smith v. Southeastern Stages, Inc.*, 479 F.Supp. 593, 594–95 (N.D.Ga.1977):

The difficulty with the plaintiffs' motion, however, is that a motion to strike is only

---

81. It is inappropriate for the court to substitute its own judgment as to what data an expert should rely on in reaching his or her opinion. However, the court can make findings as to what data experts in a given field generally rely on in forming opinions. *See, e.g., Indian Coffee Corp. v. Proctor & Gamble Co.*, 752 F.2d 891 (3rd Cir.1985), *cert. denied*, 474 U.S. 863, 106 S.Ct. 180, 88 L.Ed.2d 150 (1985).

appropriately addressed toward matters contained in the pleadings, Fed.R.Civ.P. 12(f), and affidavits submitted in support of a motion are clearly not within that category. *See* Fed.R.Civ.P. 7. Regardless of the practice followed in other forums, this court does not sanction the use of a rule 12(f) motion for the advancement of objections to an affidavit filed in support of a motion. See Wright and Miller, Federal Practice & Procedure § 1380. It is sufficient for the party opposing the motion to register its objection to the movant's affidavits by way of the material submitted in opposition to the motion. The court will then implicitly, if not explicitly, rule upon these objections in its considerations of the motion.

*Id.; see also Friedlander v. Troutman, Sanders, Lockerman & Ashmore,* 595 F.Supp. 1442, 1443 (N.D.Ga.1984), *rev'd on other grounds,* 788 F.2d 1500 (11th Cir. 1986). As indicated above, the court has read and considered all of the affidavits filed in conjunction with the submitted objections. The court has found some of the objections meritless. Accordingly, plaintiffs' motion to strike affidavits is DENIED.

## VI. CONCLUSION

The issue present in this case, whether spermicide causes birth defects, vividly displays the frontiers of the interaction of law and science and the difficulty of determining cause and effect. This case was filed at the same time as the *Wells* case. Due to procedural impediments, the resolution of this case has been slower than the *Wells* case. A long delay in reaching a decision is difficult to justify. In this case the delay has allowed applicable scientific evidence and the law to catch up with key factual issues raised in this case. Although the result is different from that reached in *Wells*, there is no conflict between the two decisions. In just a few short years, the scientific community has arrived at a consensus that spermicide does not cause birth defects such as Crystal's. In a similar brief span, the law has changed the nature of the legally sufficient evidence necessary to survive a motion for summary judgment. The basis for the rules of evidence now rationally require that inadequately supported expert testimony be excluded. Rule 703 requires the basis of the opinion to be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."

Based on the foregoing, the Court concludes that the opinions of plaintiffs' experts are not based upon the type of data reasonably relied upon by experts in determining the cause of birth defects. Accordingly, defendant's motion for summary judgment is GRANTED. Defendant's motion to preclude the testimony of plaintiffs' proposed causation experts is GRANTED. Defendant's motion for a hearing *in limine* to determine their qualifications and the admissibility of their opinions is DENIED. Plaintiffs' motion to strike certain affidavits is DENIED. The Clerk is DIRECTED to enter summary judgment in favor of the defendant.

SO ORDERED.